## THE STADACONA (two cases).

### (Circuit Court of Appeals, Sixth Circuit.  May 8, 1917.)

#### Nos. 2890, 2891.

1. ADMIRALTY ⬤⇒118—APPEAL—REVIEW.
    An appellant in admiralty, as in equity, is confined to the limits he voluntarily imposes when he appeals, and the appellate court is not called upon to review in his interest such findings of the trial court as he has not challenged by his appeal or assignments of error.
    [Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 758–775, 794.]

2. COLLISION ⬤⇒71(2)—FAULT—VESSELS MANEUVERING IN SLIP.
    The steamship Stadacona, lying in a slip, on request moved astern to the end of the slip to permit the Onoko, farther in, to move out between her and another vessel on the opposite side of the slip. When the Onoko passed out, she was swung by the wind and current against the Stadacona's propeller, and one of the blades punctured her hull, causing a leak which compelled her to beach after proceeding a distance on her voyage, and also damage to her cargo. Held, on the evidence, that the primary fault was that of the Onoko in failing to take measures to prevent swinging against the Stadacona, and that the fact that the latter's propeller was moving slowly at the time was not such a contributory fault as rendered her liable to the Onoko or to the cargo owner.
    [Ed. Note.—For other cases, see Collision, Cent. Dig. § 101.]

3. COLLISION ⬤⇒17—CONTRIBUTORY FAULT.
    Where the danger has been created by the fault of one vessel, the other will not also be condemned, unless her fault appears clearly and satisfactorily.
    [Ed. Note.—For other cases, see Collision, Cent. Dig. § 16.]

Appeals from the District Court of the United States for the Eastern Division of the Northern District of Ohio; John H. Clarke, Judge.

Suit in admiralty for collision by the Nicholas Transit Company, owner of the steamship Onoko, and by Alexander D. Thomson, against the steamship Stadacona. Decrees for respondent, and libelants appeal. Affirmed.

In October, 1912, the steamer Onoko, fully laden, was about to leave the Great Northern slip in the harbor at Duluth. The steamer Stadacona lay, along the same (east) side of the slip just astern of the Onoko. The Stadacona was light and was waiting to load; her stern was about 100 feet from the outer end of the slip; both vessels were heading into the slip. The width of the slip was 150 feet. Just as the Onoko was preparing to back out between the Stadacona and the west pier, or was engaged in so doing, the steamer Rochester backed into the slip along the west side and made fast opposite the Stadacona. The Onoko then undertook to back out between the two other vessels, but the space was too narrow. At the Onoko's request, the Stadacona moved astern about 50 feet. The Onoko tried again, but was still unable to get through. The Stadacona again went back until her stern was about even with the end of the east pier. The space to get through being still insufficient, the Rochester moved further into the slip. The Onoko then came out, but the wind and the current, both from the west across the end of the slip, joined with the fact that the Onoko was low, while the Stadacona was high, in the water, operated to swing the Onoko under the stern of the Stadacona, so that one of the latter's propeller blades punctured the Onoko's hull 4 feet below the water line on the port quarter. The happening of the injury was known to both boats, a piece of the propeller blade being broken

off; but such examination as the Onoko made disclosed no considerable injury, and she started down the lake. After about six hours, it became evident that water was coming in dangerously, and no harbor being accessible, the captain thought it was prudent to, and did, run her on the beach. Later she made some repairs, was drawn off, and was able to proceed on her voyage. It turned out that the damages, approximately, were: To the cargo, $12,000; to the Onoko, $3,000; and to the Stadacona, $125.

In the court below, Thomson, the cargo owner, filed a libel (No. 2891) against the Stadacona, alleging that the latter's wheel was working when it should not have been, and that this was negligence which was a cause of the damage. The Stadacona vouched the Onoko into the case under the fifty-ninth admiralty rule (29 Sup. Ct. xlvi), and also filed a cross-libel against the Onoko to recover the $125 damage. In a separate earlier proceeding (No. 2890), the Onoko had libeled the Stadacona to recover its $3,000 damage. The District Court came to the conclusion that there was no actionable fault on the part of either boat of which the other could complain, and dismissed all the libels and proceedings. The Nicholas Transit Company, owner of the Onoko, appeals, because it failed to recover its damages, and Thomson, the cargo owner, appeals, because the Stadacona was not held in fault.

In Case No. 2890:

F. S. Masten, of Cleveland, Ohio, for appellant.

H. D. Goulder and R. G. McCreary, both of Cleveland, Ohio, for appellee.

In Case No. 2891:

T. Catesby Jones, of New York City, for appellant.

H. D. Goulder and R. G. McCreary, both of Cleveland, Ohio, for appellee.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). [1] In so far as Thomson's libel became, through the operation of the fifty-ninth rule, an assertion of a claim against the Onoko, there is no issue for this court to review. Neither by his petition for appeal nor by his assignments of error has Thomson challenged the rightfulness of the trial court's seeming conclusion that there was no liability from the Onoko to Thomson. He prosecutes his appeal solely as against the Stadacona. The question whether the Onoko was in fault is therefore not before us, excepting as it may be incidentally involved in determining the fault of the Stadacona or the proximate character of the resulting damages; but in either of these aspects it may be important and may demand decision. We are not called upon to consider how far an appellee may be heard as against the decree from which he has not appealed; and we do not read Reid v. Fargo, 241 U. S. 544, 548, 36 Sup. Ct. 712, 60 L. Ed. 1156, as being inconsistent with the rule that the appellant, in admiralty as in equity, is confined to the limits he voluntarily imposes when he appeals.

[2] It is clear to us that the primary fault was on the part of the Onoko. While we are not permitted to pass judgment upon her management from the standpoint of what was apparent after the accident, and while the situation must be judged as it should have appeared to competent men at the time, yet from that standpoint it is difficult to see any justification for what was done. There was nothing necessarily

blameworthy merely in attempting to squeeze through between the Stadacona and the Rochester; such things must sometimes be done in a crowded slip; but it must have been apparent that the wind and current would strike the Onoko's stern as soon as it emerged from the slip, and would swing it strongly to port, and that this tendency would be increased by backing. There is no satisfactory foundation for the claim that the wind and the current materially increased during the short time occupied in getting out. When the maneuver started, the stern of the Stadacona was so far inside the slip that the almost inevitable swing of the Onoko would have carried her against the corner of the east pier; and around this corner she could very likely have swung as upon a pivot without injury to herself; but before the critical time came the Stadacona, acting at the request of the Onoko, had moved out so that her stern would necessarily be substituted for the corner of the pier as the pivot of this motion, and, considering the respective heights of the two vessels, collision between the hull of the Onoko and the propeller of the Stadacona was highly probable. Not only was this the natural result of an attempt of the Onoko to get out with her own wheel, under these conditions, but the safe and simple means of avoiding any danger were equally obvious. A line from the Onoko's starboard quarter to the west pier, to hold her up against the wind until she could get far enough out to be safe, or to be used in working her stern around the end of the west pier, was so certainly the safe and simple method of getting out that no plausible reason for not adopting it is suggested. The Rochester had just come in along this pier with the aid of a line. The use of a tug—the means finally employed after the accident had happened—was another safe, though less simple, method.

The only reason alleged for not using a stay line is that the Rochester was in the way, or that it was too far; but this is no excuse, for, if it was not feasible to pass the line to or over the Rochester, there is no reason to doubt that she would have moved forward out of the way, as she later did, seemingly as soon as requested; and if it was too far to throw a line, the Onoko's stern could have been worked closer, as was later done, by a port bow line and a forward movement. It is said also that the Stadacona made no objection to the effort of the Onoko to go out as she did, and that, hence, we should infer that the method appeared safe enough. Even if the Stadacona should be charged with knowledge that the Onoko had not put out any line and did not intend to, we do not see that the Stadacona owed any such duty of warning as to raise the suggested inference. The time which elapsed after the Stadacona had moved back to her last position was short, her officers were interested in the scraping of the Onoko alongside, the Stadacona was not about to encounter the cross wind and current, and the fact that they did not quickly apprehend what these elements would do to another boat, with the navigation of which they were not charged, does not go very far in excusing similar inattention on the part of those who did carry the duty.

Our conclusion that the trouble was caused by the Onoko's neglect of ordinary care in observing her duty as the moving vessel not

to injure one which was stationary, in a crowded slip, is but an application of a familiar rule, which is exemplified by many cases from which the following may be selected as more or less closely analogous to the one before us: Humphrey v. Warner (D. C.) 45 Fed. 270, 272; The Michigan (C. C.) 52 Fed. 501; The Miller (C. C. A. 1) 76 Fed. 877, 22 C. C. A. 597; The Rhein (C. C. A. 2) 204 Fed. 252, 122 C. C. A. 520. This leaves, as the only question for consideration, whether the Stadacona so contributed to the ultimate result that she is liable to the cargo owner. The claim of such contribution (although made as a claim of primary fault) consists in the charge that the Stadacona's wheel was wrongfully moving at the time of the collision, and that it was because of this wrongful motion that the propeller blade cut a hole through the Onoko. Many of the physical facts render it extremely doubtful whether the wheel was in motion at the moment of collision, but we cannot think this a controlling matter. There is no claim that its rapid motion caused suction, or that it influenced the action of either boat. If moving at all, it was very slowly, and many other facts must be considered in that connection. The Stadacona was fast to the dock by both bow and stern lines. In compliance with the Onoko's request, she determined to move back. This was naturally to be accomplished by releasing the bow line and hauling in that on the stern. To aid this stern pull, the wheel was started in reverse; but this was for only a few turns, and then the wheel was stopped. The same thing was repeated for the next backward motion, also taken at the Onoko's request, except it may be that this time, after the extreme position was reached at the end of the pier beyond which the Stadacona would not go, the engine was not stopped, and the wheel continued to revolve. All agree that the motion (if any) was as slow as possible, so that it was barely turning over and was stopped within half a turn after the blow.

We are unable to see that this kind of motion so substantially increased the risk to the Onoko that it could, in any event, and under the situation here present, be considered as a negligent act which contributed to the result. If the propeller had been at rest, no one can say that the same result would not have happened. The force of the blow came almost negligibly from the revolution of the blade, but mainly from the momentum of the heavily laden Onoko. If the propeller had been at rest, and the two nearest blades had happened to be at the most favorable angles, extending upwardly and downwardly, they might have been bent over or broken without penetrating the hull; but, if not, there would have been two punctures, instead of one. If a single blade had been caught pointing toward the hull, penetration was sure. The most that can be said is that any existing slow revolution of the wheel somewhat increased the degree of that danger into which the Onoko had put herself.

[3] It is a familiar principle that, where the danger has been created by the fault of one vessel, the other will not be also condemned unless her fault appears clearly and satisfactorily (The Victory et al., 168 U. S. 410, 422, 18 Sup. Ct. 149, 42 L. Ed. 519; The Chicago [C. C. A. 2] 125 Fed. 712, 714, 60 C. C. A. 480; The Lans-

down [D. C.] 105 Fed. 436, 443; The Saratoga [D. C.] 180 Fed. 620, 623); and while, perhaps, this rule cannot be applied in full force when it is the innocent cargo owner who sues, yet he carries at least the ordinary burden of proof; and when we find that the defendant boat was intending to comply with the request of the cargo carrier, that the act which is criticized as a fault would have been natural and harmless, except for the mishandling of the cargo boat, and that it is left in doubt whether this act, if it occurred, did contribute in the least to the damage suffered, we must conclude that the cargo owner has not successfully carried his burden.

The decree below is affirmed.