## Petition of CAHILL TOWING LINE, Inc. THE ANNA W.

Circuit Court of Appeals, Second Circuit. November 1, 1927.

### No. 11.

**1. Collision ⟜67—Dredge, struck by passing tow, is free from fault, if there is ample room; but placing her so as to obstruct navigation is negligence.**

Though a dredge lawfully engaged in digging channel may maintain her position and be deemed free from fault, when collided with by a passing tow, if there is ample water for passage, or if tug and tow have full opportunity to see her location, she must be free from fault in the location she selects, and to place her in the path of navigation, where she becomes a hindrance and obstruction, is negligent.

**2. Collision ⟜71(3)—Dredge, working near drawbridge, held solely at fault when tug and tow collided therewith, after passing through draw.**

Dredge, engaged in digging channel under contract requiring work to be done so as to obstruct navigation as little as possible, and, if channel is obstructed, to promptly remove dredge on approach of vessels, *held* solely at fault when tug and tow collided therewith after coming through drawbridge, in that dredge failed to give warning of its location near draw, or make any effort to raise its spuds, which she might have done and avoided collision.

L. Hand, Circuit Judge, dissenting in part.

Appeal from the District Court of the United States for the Eastern District of New York.

Libel by the Morris & Cumings Dredging Company against the steam tug Anna W and the coal barge Nahant. Thereupon a petition for limitation of liability was filed by the Cahill Towing Line, Inc., as owner of the steam tug Anna W. A libel was also filed by J. J. Hock et al., as owners of the barge Nahant, against the dredge No. 7, and Morris & Cumings Dredging Company for damages to the Nahant. The three cases were consolidated. Decree was entered for Morris & Cumings Dredging Company against the Cahill Towing Line, Inc., for its damage to the dredge No. 7, and dismissed the libel

22 F.(2d)—18

against the barge Nahant; also for the barge Nahant for its damage against the No. 7 and its claimant Morris & Cumings Dredging Company, and against the petitioner Cahill Towing Line, Inc.; also granting the petition for limitation of liability to the Cahill Towing Line, Inc. Morris & Cumings Dredging Company appeal. Decree modified.

Bigham, Englar & Jones, of New York City (James D. Carpenter, of Jersey City, N. J., and Charles W. Hagen, of New York City, of counsel), for appellant.

Foley & Martin, of New York City (W. J. Martin, of New York City, of counsel), for the Anna W.

Barry, Wainwright, Thacher & Symmers, of New York City (John C. Prizer and Paul L. Clugston, both of New York City, of counsel), for Hock and others, owners of the Nahant, appellees.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

MANTON, Circuit Judge. The New Jersey Central Railroad maintains a drawbridge across the Newark Bay, and for navigation purposes there are provided east and west draws. On July 11, 1924, the east draw was being repaired and was closed to navigation, leaving the west draw only for vessels' passage. On the afternoon of this day, the steam tug Anna W proceeded with a loaded coal barge, the Nahant, on her port side, toward and through the west draw on its way to Kearney, N. J. When the tow approached the drawbridge, she blew a signal for the west draw to open. A train was passing, which temporarily forbade this being done. In answer to a repeated signal, the draw was opened, after the passage of the train, and the tow entered this waterway at about 1:50 p. m. The tide was flood, running 4 miles an hour, the weather was clear, and the wind southwest. On the opposite side of the draw, the dredge No. 7 lay anchored, with her spuds down, on the westerly side of the channel. There was an overcut of 15 feet in width extending westerly on the westerly side of the channel. Such overcut was made for a necessary slope of that side of the channel. Morris & Cumings Dredging Company, the owner of the dredge No. 7, had a contract for dredging the channel, and were fulfilling it by the work of this dredge. The contract, among other things, provided:

"The contractor will be required to conduct the work in such manner as to obstruct navigation as little as possible, and in case that the contractor's plant so obstructs the

channel as to make difficult or endanger the passage of vessels, it shall be promptly removed on the approach of any vessel to such an extent as may be necessary to afford a practicable passage."

The west draw was 82 feet 3 inches wide, and the center tier 210 feet long. The Anna W was 110 feet long, 25 feet 6 inches beam, and the Nahant 247 feet long, and 37 feet beam. The No. 7, 147 feet long, 48 feet beam, and 16 feet sides, was lying about 600 feet northerly from the point between the tracks at the center of the westerly draw. The opening of the draw was immediately to her stern.

Before the draw opened, the master of the Anna W saw the mast and beam of the No. 7, but could not estimate the distance the dredge lay from the bridge, because of the latter's obstruction of the view. As the draw opened, the tow was headed for the opening and slowly navigated. After the draw was opened, the master discovered the dredge with a loaded scow, about 150 feet long, lying along its starboard side and overlapping her bow. The stern of the scow was 15 feet forward of the stern of the No. 7. At this sight, the Anna W sounded alarms, stopped her engines, and reversed full speed. The tide sets through the draw, and after passing through, a little westerly and then easterly. No anchor could have been dropped by the tug until the draw was clear, because of crossing cables north of the bridge. But, after passing clear, on order of the master of the tug, the captain of the barge Nahant, after rolling his wheel hard aport and slipping a becket on, ran forward, dropped a starboard anchor, and then a port anchor. The Anna W continued going astern, endeavoring to prevent a collision. The Nahant was thus headed easterly, but dropped down on the No. 7, the port side of the Nahant's aft coming in contact with the stern of the No. 7. The No. 7 stern was toward the draw. Immediately following this tow, there came through the draw another steam tug, the Hallenbeck, and a coal barge. Observing what had happened, this tow was held across the draw. The Anna W, observing the new danger thus created to the Hallenbeck, proceeded to her assistance, leaving the Nahant lying across the stern of the No. 7. The Hallenbeck and her tow were about the same dimensions as the Anna W and her tow. After releasing the Hallenbeck and her tow, and making safe the latter, the Anna W and the Hallenbeck took the Nahant from across the stern of the No. 7.

It was found below that the Anna W was seen by the captain of the No. 7 from the time she first sounded the alarm. She continued to sound alarms several times going through the draw. Nothing whatever was done by the No. 7 to assist in making the passage safe. The No. 7 was not working at the time. She did not raise her spuds. She had lain in her then position since 8 a. m., advancing but a short distance northerly during the day. She had never before or after worked so close to the draw. The master of the Anna W did not know of her close proximity to the draw. Since the Nahant was 247 feet long, he could not proceed easterly until her stern had cleared about 210 feet northerly from the draw. This left about 145 feet between the abutment and the No. 7 for the Anna W to maneuver, and to carry the Nahant to the eastward and clear the No. 7. Many small tows had passed safely that day, but this was the largest to attempt passage. With these tidal conditions, knowledge of which is chargeable to the dredge, the close proximity of the dredge and dumper, about 35 feet in all, to the bridge, made the navigation of the tug and tow, considering the size and free waterway, a most difficult task.

[1] The rule that vessels in motion are required to keep out of the way of vessels at anchor, if the latter are without fault, has little application here. This moving tow is exonerated from blame, because it was not in her power to prevent the collision by the exercise of all practical precaution. The Virginia Ehrman, 97 U. S. 309, 24 L. Ed. 890. While a dredge may maintain her position and be held free from fault (The Norge [C. C. A.] 55 F. 347), she must be free from fault in the location she selects. Ordinarily a dredge, lawfully engaged in digging, collided with by a passing tow, will be regarded as free from fault, if there is ample free water for passage (The Overbrook [D. C.] 149 F. 785), or where an oncoming tug and tow have full opportunity to see her location and visualize the hazards of passing (The Fort George [C. C. A.] 183 F. 731; The D. H. Miller [C. C. A.] 76 F. 877). But there are limits which even a dredge so engaged may not exceed. To place her in waters in the path of navigation, where she becomes a hindrance and obstruction, is negligent.

[2] Voluntarily assuming a position in such close proximity to the bridge created a danger, the perils of which must have been obvious to her. The John H. Starin (C. C. A.) 122 F. 236; Merritt & Chapman Co. v. Cornell Steamboat Co. (C. C. A.) 185 F. 261. Further, it was a contractual obligation on the part of the dredge, since it obstructed

the channel and made difficult and endangered the passage of vessels, to promptly move on the approach of any vessel, or to assist in the passage by making way. The dredge was chargeable with knowledge of the full extent to which she obstructed navigation, and it was her obligation to have due regard for the rights of navigators who lawfully might pass. She gave no notice or warning of her location. She was as a fixed structure. She made no endeavor to raise her spuds, which she might have done in the time open to her. If her spuds had been raised, the collision could have been avoided. The damage, at most, would have been trifling. The oncoming tow gave notice of its approach to the bridge and the desire for the draw to open by its signal. This gave time for raising the spuds.

The Anna W cannot be charged with fault, based on the claim of increasing her speed after she headed into the waterway of the draw when it opened. Her engines were backing until after the bow of the barge entered the draw. She had started up under one bell about 50 feet from the bridge, and was substantially drifting, having reduced her speed as much as possible under the circumstances. Nor can her maneuver be compared with that of the Hallenbeck and criticized. The Hallenbeck was brought to a standstill by having the stern of the barge against the westerly rack, and bow against the stern of the Nahant, as she lay in contact with the dredge. No charge may be successfully lodged against the tug and tow for failure to give signals of their approach. The collision was brought about through the sole fault of the dredge.

The decree will be modified, by exonerating the Anna W and directing a decree against the No. 7 and her owners.

Decree modified.

L. HAND, Circuit Judge (dissenting in part). I think that the only doubtful point in the decision below is whether the dredge had enough time to raise her spuds after getting the direct signals of the Anna W. This was the first moment at which she was called upon to move, because her berth was lawful. It rather seems to me that the Anna W has not carried the burden upon her on that issue, but any conclusion is at best very uncertain, and the dredge was certainly inattentive. On the whole, I think that the appellant has not made a clear enough case to upset the finding by the District Court, so far as concerns the spud damage, by far the larger part.

Therefore I think that the decree should be affirmed as to the spud damage, and modified as to the rest, by holding only the Anna W.