THE FREEPORT.

THE MARGARET.

THE MAINE.

NORFOLK DREDGING CO. v. COTTMAN CO.

No. 4333.

Circuit Court of Appeals, Fourth Circuit.

Nov. 19, 1938.

R. M. Hughes, Jr., of Norfolk, Va. (Hughes, Little & Seawell, of Norfolk, Va., on the brief), for appellant.

William A. Grimes, of Baltimore, Md. (Ritchie, Janney, Ober & Williams, of Baltimore, Md., and Vandeventer & Black and Braden Vandeventer, all of Norfolk, Va., on the brief), for appellee.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

PARKER, Circuit Judge.

On September 27, 1935 the tug Margaret towing the barge Maine alongside proceeded up the Rappahannock River to Fredericksburg, Va., passing the dredge Freeport about the middle of Snowden's Bar Reach a quarter of a mile south of Dangerfield Short Turn, engaged in deepening the 120 foot cut channel. The next morning the Margaret proceeded down the river towing the Maine astern on a 25 fathom hawser. After rounding the Dangerfield Short Turn and coming in view of the Freeport about a quarter of a mile down the stream, the Margaret shut off her engines except for a few short kicks ahead and was drifting with the ebbing tide. While proceeding in this fashion, she lost steerageway and stranded on the north bank of the channel opposite the dredge, and the bow of the oncoming barge collided with her sterm, causing damage to both. The court below held that the collision was due to the fault of the dredge in obstructing the channel and assessed the damages against her, and her owner has appealed. Upon a careful review of the record, however, we do not think that this finding of fault is sustained.

The dredge, as stated, was engaged in deepening the 120 foot cut channel of the river and had been so engaged under a contract with the federal government for two years or more. She was proceeding with the work down the river; and it was her custom to put down her spuds in the channel which she was dredging on the side towards which she was discharging mud from her pipes, leaving the other side unobstructed for navigation. As she was 80 feet long and could swing around on her spuds, as on a pivot, she could reach across the channel with the other end from which the suction pipes, or ladder, projected to the bottom. When engaged in dredging across the channel in this way, she would swing on her spuds to permit the passage of traffic. The Margaret, a tug 144 feet long and 26 feet wide, and drawing 11 feet of water, had been going up and down the river on an average of once every two weeks while the dredging operations had been going on; and there is no evidence that there had ever been any

necessity of the dredge doing anything other than swing around on her spuds to sufficiently clear the channel for her passage. In fact this was all that was done the preceding day, when the dredge was in practically the same position although a little farther up the river, when the Margaret passed towing the Maine alongside and occupying 66 feet of the channel, as the Maine had a width of 40 feet. There is no evidence that the dredge ever pulled her spuds and moved her spudded end for the purpose of clearing the channel for the passage of the tug and tow.

At the time of the stranding of the tug here under consideration, the dredge was spudded in the southern half of the channel and had been discharging on the south bank of the river. She was working, although not actually sucking up mud at the time. This operation had been suspended temporarily in order that the pipe lines to the shore might be moved farther down the river; and, while this was being done, minor repairs were being made on the engine. Her free end had been swung towards the south shore; and at least half of the cut channel was left entirely unobstructed for purposes of navigation. The evidence shows very clearly that ample room was available for the passage of the tug and barge, the evidence being that from 75 to 90 feet was available between the north corner of the spudded end of the dredge and the north bank of the river. The Captain of the tug estimated the clearance between the dredge and the north edge of the usable water as 60 feet; and the mate testified that the tug and tow could have gone through all right if the tug had not run aground on a "lump" on the bottom of the channel. Both the Captain and the mate and also the tug's witness Manning attributed the grounding to the presence of this "lump"; but the evidence shows conclusively that there was no "lump" and that the tug stranded on the north bank of the channel as a result of sheering when she lost steerageway.

The learned District Judge thought that the dredge was in fault in not pulling up her spuds and moving over to the south side of the channel when she drew her free end over to the south side; but we do not think that fault can be predicated with respect to this. She had left at least half the channel free and open to navigation and had afforded the tug and tow all the opportunity for passage that had been customary so far as this record discloses. The grounding seems to have been due, not to the fact that sufficient room was not afforded for passage, but to the fact that the Captain of the tug unnecessarily shut off her engines and lost control of her in the ebb tide in which she was moving. If he had maintained sufficient speed to preserve control, no reason appears why he might not have passed the dredge in safety, as he had done many times before under apparently similar circumstances.

The Act of March 3, 1899, ch. 425, sec. 15, 33 U.S.C.A. § 409, relied upon by appellee, has no application, since, for the reasons stated, the dredge was not tied up or anchored in such a way as to prevent or obstruct the passage of other vessels or craft. Nor were rules 12 and 14 adopted by the Board of Supervising Inspectors violated, since the channel of the river was not unnecessarily obstructed and clear passage was afforded by the dredge. The rule applicable is that a dredge lawfully engaged in digging will be regarded as free from fault if there is ample free water for passage. The Overbrook, D.C., 149 F. 785; The Anna W., 2 Cir., 22 F.2d 273, 274. As said by this Court in The Caldy, 4 Cir., 153 F. 837, 840, "If a vessel anchors at a point in a channel where, notwithstanding such anchorage, other vessels, navigated with the care the situation requires, can safely pass, then she has neither violated the statute, nor rendered herself liable under the general rules applicable to navigation, even though to a certain extent she has obstructed the channel." See, also, The Strathleven, 4 Cir., 213 F. 975, 977, and The City of Norfolk, D.C., 248 F. 780. What was said by Judge Byers in the case of the Irene W. Allen, D.C., 17 F.Supp. 444, 446, is applicable here: "The Allen had passed the dredge safely probably one hundred times, and therefore her requirements as to full clearance were known and understood. If she had been handled properly on this occasion, there is no reason to think that she would have encountered difficulty."

For the reason stated, we are unable to find fault on the part of the dredge and the decree appealed from will accordingly be reversed.

Reversed.